# In the United States Court of Federal Claims

No. 08-925 C

(E-Filed: November 30, 2009)

| | |
|---|---|
| CAPTAIN ROSS E. JOSLYN, | ) )  ) |
| Plaintiff, | ) Motion to Dismiss; Money- |
| | ) Mandating Statute; Motion for |
| v. | ) Judgment upon the Administrative |
| | ) Record; 10 U.S.C. § 1201; 37 |
| THE UNITED STATES, | ) U.S.C. § 204 |
| | ) |
| Defendant. | ) |
| | ) |

Michael D.J. Eisenberg, Washington, DC, for plaintiff.

James P. Connor, Washington, DC, with whom were Tony West, Assistant Attorney General, Jeanne E. Davidson, Director, and Reginald T. Blades, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, for defendant. Major Kelly L. McGovern, Military Personnel Branch, Army Litigation Division, United States Army, Arlington, VA, of counsel.

OPINION

HEWITT, Chief Judge

Before the court are Defendant's Motion to Dismiss or, in the Alternative, Motion for Judgment upon the Administrative Record (defendant's Motion or Def.'s Mot.); Plaintiff's Opposition to Defendant's Motion to Dismiss or, in the Alternative, Motion for Judgment upon the Administrative Record (plaintiff's Response or Pl.'s Resp.); and Defendant's Reply in Support of Motion to Dismiss and Motion for Judgment upon the Administrative Record, and Response to Plaintiff's Motion for Judgment upon the Administrative Record (defendant's Reply or Def.'s Reply). Plaintiff's Response contains a cross-motion for judgment upon the Administrative Record. Pl.'s Resp. 1, 15 (requesting judgment in favor of plaintiff based on the Administrative Record). For the reasons stated below, defendant's Motion to Dismiss is GRANTED; or, in the alternative,

defendant's Motion for Judgment upon the Administrative Record is GRANTED, and
plaintiff's Cross-Motion for Judgment upon the Administrative Record is DENIED.

I.      Background

        Plaintiff's claims stem from his discharge from the United States Army (Army) in
December 2008.  See Complaint (Compl.) ¶ 1.  To set the dispute in context, the court
will summarize the process the Army uses to determine when it is appropriate to
discharge a soldier by reason of medical disability, describe the circumstances of
plaintiff's discharge and review the procedural history that led to plaintiff's Complaint.

        A.      The Army's Disability Evaluation System

        Congress provided the Secretaries within the Department of Defense, including the
Secretary of the Army (Secretary), with general guidelines for the retirement or separation
of military personnel due to physical disability in 10 U.S.C. §§ 1201-1222 (2006), but
each Secretary has broad discretion to design the regulations for the disability system, see
10 U.S.C. § 1216 (a)-(b), (d) (2006) ("The Secretary concerned shall prescribe regulations
to carry out this chapter within his department. . . .  Except [for reasons of age or length
of service] the Secretary concerned has all powers, functions, and duties incident to the
determination under this chapter . . . .").  Army Regulation (Army Reg.) 635-40
establishes the Army Physical Disability Evaluation System under the provisions of Title
10, United States Code, Chapter 61 and Department of Defense Instruction 1332.18.
Army Reg. 635-40, ¶ 1-1 (Feb. 8, 2006).  Army Reg. 635-40 "sets forth policies,
responsibilities, and procedures that apply in determining whether a Soldier is unfit
because of physical disability to reasonably perform the duties of his or her office, grade,
rank, or rating."  Id.

        The Army Physical Disability Evaluation System (DES) consists of several phases
of evaluation and review that result in a final disability determination for a soldier.  When
a question arises as to a soldier's ability to perform the duties of his or her office, grade,
rank or rating because of physical disability, the soldier's commander, the commander of
the medical treatment facility (MTF) treating the soldier, or the Commander, U.S. Army
Human Resources Command (HRC), may refer the soldier to the responsible MTF for
medical evaluation.  Army Reg. 635-40, ¶¶ 4-6 to 4-8.  Upon referral, the MTF
commander will conduct an examination of the soldier and, if it appears the soldier is not
medically qualified to perform duty, will refer the soldier to a Medical Examination
Board (MEB).  Id. ¶ 4-9.  The MTF commander will also appoint a Physical Examination
Board Liaison Officer (PEBLO) to counsel a soldier undergoing physical disability
processing.  Id. ¶ 2-8.

2

An MEB is convened to document a soldier's medical status and duty limitations and make a decision as to the soldier's medical qualification for retention based on the criteria in Army Reg. 40-501, chapter 3. Id. ¶ 4-10. The Narrative Summary prepared for the MEB by the referring physician is "the heart of the disability evaluation system." Id. ¶ 4-11. The Narrative Summary describes a soldier's conditions, including the "history of the [s]oldier's illness, objective findings on examination, results of X-ray and laboratory tests, reports of consultations, response to therapy, and subjective conclusions with rationale." Id. The Narrative Summary must also establish a correlation between the soldier's medical defects and physical capabilities, and if the soldier is diagnosed with a mental disorder, must include a statement indicating whether the soldier is mentally competent and capable of understanding the nature of, and cooperating in, Physical Evaluation Board (PEB) proceedings. Id. Narrative Summaries will not reflect a conclusion of unfitness, and therefore, should not include terms such as "unfitting" or "disqualifying." Id. If the MEB determines that the soldier does not meet medical retention standards, it will recommend referral to a PEB, which then determines whether the soldier is fit or unfit for duty. Id. ¶¶ 4-10, 4-19.

The PEBLO advises the soldier of the MEB results, and the soldier is given the opportunity to read and sign the MEB proceedings. Id. ¶ 4-12. If the soldier does not agree with any item in the MEB report or Narrative Summary, he or she is advised regarding appeal procedures. Id. The MTF commander notifies the soldier's unit commander of the PEB referral and obtains a written statement from the unit commander confirming whether any adverse personnel action is being considered against the soldier and describing the soldier's current duty performance. Id. ¶ 4-15. In addition, the soldier may provide additional information to the MTF commander to forward to the PEB, including information from the unit commander, supervisor, or other persons who have knowledge regarding the effect the condition has on the soldier's ability to perform his or her duties. Id. ¶ 4-13.

The role of PEBs is "to evaluate all cases of physical disability equitably for the [s]oldier and the Army." Id. ¶ 4-17. A PEB is a fact-finding board, and its findings and recommendations may be revised. Id. Its purpose is to: (1) investigate "the nature, cause, degree of severity, and probable permanency" of the referred soldier's disability; (2) evaluate "the physical condition of the [s]oldier against the physical requirements of the [s]oldier's particular office, grade, rank, or rating"; (3) provide "a full and fair hearing" for the soldier as required by 10 U.S.C. § 1214; and (4) make "findings and recommendations required by law to establish the eligibility of a [s]oldier to be separated or retired because of physical disability." Id. All PEB findings must be based on a preponderance of the evidence, and its recommendations must be supported by the findings. Id. ¶ 4-19a.

3

"The first and most important determination" the PEB makes is whether the soldier is physically fit or unfit to perform the duties of the soldier's office, grade, rank, or rating. Id. ¶ 4-19d(1). "The mere presence[] of an impairment does not, of itself, justify a finding of unfitness because of physical disability. In each case, it is necessary to compare the nature and degree of physical disability present with the requirements of the duties the [s]oldier reasonably may be expected to perform because of [his or her] office, grade, rank, or rating." Id. ¶ 3-1. All other actions are directly or indirectly tied to this finding of fitness or unfitness. Id. ¶ 4-19d(1). Only after establishing that the soldier is unfit because of physical disability does the PEB decide the percentage rating for each unfitting compensable disability. Id. ¶ 4-19i.

Each case is first considered by an informal PEB, a process designed to reduce overall DES processing time without sacrificing the detailed and uniform evaluation of each case. Id. ¶ 4-20a. The informal PEB's findings and recommendations are presented on DA Form 199, which also lists the election options available to the soldier: (1) concurrence and waiver of a formal hearing; (2) nonconcurrence, submission of a rebuttal and waiver of a formal hearing; (3) demand for formal hearing with or without personal appearance; and (4) choice of counsel if a formal hearing is demanded. Id. ¶ 4-20b-c. The PEB must receive the election within ten days from the soldier's receipt of the informal findings. Id. ¶ 4-20c(3). The PEBLO, acting as counselor for the soldier during this process, is primarily concerned with the soldier's interests, and should consult and obtain legal advice as needed. Id. ¶ 4-20d. The soldier should be made fully aware of the election options available to him or her, the processing procedures, and the benefits to which the soldier will be entitled if separated or retired for physical disability. Id. ¶ 4-20d(1).

A soldier is entitled to a formal hearing, with counsel, if requested after informal consideration by a PEB. Id. ¶ 4-21a. The formal PEB board is normally composed of the same members who considered the case informally. Id. ¶ 4-21b. The purpose of the formal hearing is "to afford the [s]oldier the opportunity to present views, testimony, and new evidence," which the board members must consider "with open minds despite their earlier decisions." Id.

Immediately after deliberation, the formal PEB informs the soldier, via DA Form 199, of its findings and recommendations, which it may change, modify, or correct at any time before the record of proceedings is delivered to the U.S. Army Physical Disability

Agency (PDA) or HRC.[1]  Id. ¶ 4-21r.  The soldier may respond with an election on DA Form 199-1 and a letter of rebuttal, both of which must be received at the PEB within ten days after the soldier's receipt of formal findings, unless the PEB approves a request for an extension of time.  Id. ¶ 4-21s.  If the PEB does not receive the soldier's election or request for an extension of time within the ten-day period, the PEB will deem the soldier to have waived the right to an election and will forward the proceedings to the HRC for final disposition.  Id. ¶ 4-21s(2).  A soldier who fails to make an election or submit a statement of rebuttal within the allotted time forfeits the opportunity for PDA review of his or her case.  Id. ¶ 4-21s(3).

A letter of rebuttal must be prepared and processed according to the guidance provided in Army Reg. 635-40.  Id. ¶ 4-21t.  A rebuttal may be based only on one or more of the following issues and must provide rationale in support of the issue:  (1) the PEB decision was based on fraud, collusion, or mistake of law; (2) the soldier did not receive a full and fair hearing; (3) substantial new evidence exists and is submitted that, by due diligence, could not have been presented before the PEB disposition of the case.  Id. ¶ 4-21t(1).  If the PEB receives a letter of rebuttal after it has forwarded the soldier's case to HRC for final disposition, and if consideration of the rebuttal does not result in a change to the findings and recommendations, the PEB will advise the soldier in writing that no change is warranted and that the rebuttal and reply have been forwarded to HRC for inclusion in the case proceedings.  Id. ¶ 4-21t(4).  If consideration of the rebuttal does result in a change to the findings and recommendations, the PEB will recall the case and effect the necessary changes by preparing a new DA Form 199.  Id.

The PDA provides review and confirmation of PEB action in certain cases.  Id. ¶ 4-22a.  The purpose of review is to ensure that:  (1) the soldier received a full and fair hearing; (2) the MEB and PEB proceedings were conducted according to governing regulations; (3) the MEB's and PEB's findings and recommendations were just, equitable, consistent with the facts, and in keeping with legal and regulatory provisions; (4) due consideration was given to the facts and requests contained in any rebuttal submitted; and (5) the records of the case are accurate and complete.  Id. ¶ 4-22b.  Based upon review of the PEB proceedings, the PDA may concur with the PEB's findings and recommendations, return the case to the PEB for reconsideration or other action, issue

---

[1] The U.S. Army Physical Disability Agency (PDA) is under the operational control of the U.S. Army Human Resources Command (HRC).  Army Reg. 635-40, ¶ 2-4 (Feb. 8, 2006).  The PDA operates the Army Physical Disability Evaluation System (DES), including development of policies, procedures and programs of the system and review of Physical Evaluation Board (PEB) proceedings, id., while HRC accomplishes final administrative actions in processing physical disability cases and issues needed orders or other instructions for the Secretary of the Army based on decisions of the PDA, id. ¶ 2-3.

revised findings providing for a change in disposition of the soldier, or refer the case to the Army Physical Disability Appeal Board.  Id. ¶ 4-22c.  If the PDA issues revised findings, a soldier must submit an election or rebuttal within ten days after receiving the revised findings, unless an extension of time is requested and approved.  Id. ¶ 4-22d.  If the soldier fails to submit an election or rebuttal within the allotted time, the PDA will deem the soldier to have waived his or her right to file a rebuttal to the revised findings and will forward the proceedings to HRC for final action.  Id. ¶ 4-22f.

The HRC resolves the case by publishing orders or issuing proper instructions to subordinate headquarters.  Id. ¶ 4-24.  HRC-issued retirement orders or other disposition instructions may include, inter alia, permanent retirement for physical disability, separation for physical disability with or without severance pay, and return of the soldier to duty when he or she is determined physically fit.  Id. ¶ 4-24b.

B.      Circumstances of Mr. Joslyn's Case[2]

On August 10, 1992, Mr. Joslyn enlisted in the Army for a five-year period from November 1992 through November 1997.  AR 218-21.  He served on active duty from November 1992 to November 1996, when he was granted a release from active duty after the Army reduced his rank.  Compl. ¶ 10; AR 175, 195, 197, 209, 211.  In 1999, Mr. Joslyn enrolled in the Army Reserve Officer Training Corps (ROTC) Scholarship Program while he was a student at the University of Texas at Arlington.  AR 161-74. After completing the ROTC program, he was commissioned as a second lieutenant on December 15, 2001 and served as a military intelligence officer.  AR 157-60.  From May 31, 2003 to April 6, 2004, Mr. Joslyn deployed to Iraq and served in support of Operation Iraqi Freedom.  AR 132.  From June 2004 to June 2005, he served as a Brigade military intelligence officer at Fort Hood, Texas.  AR 99-102, 132.  He was then transferred to the University of Texas at Arlington to serve as an assistant ROTC instructor for approximately three years.  AR 94-98, 132, 134.  In June 2008 Mr. Joslyn was reassigned to the Fort Hood separation transfer point and in July 2008 was placed in the Warrior Transition Unit until transitioning out of the Army.  Compl. ¶ 22; AR 132, 134, 137.

According to plaintiff, on or about May 1, 2007, Lt. Col. Scott Baker informed plaintiff that "if he did not retire out of the military he would receive a negative Officer Evaluation Report," which would be detrimental to plaintiff's career.  Compl. ¶ 16.  On

---

[2] The facts are taken from plaintiff's Complaint (Compl.) and the Administrative Record (AR).  Although reference to the Administrative Record was not necessary for the court to reach its legal conclusions, the court cites the Administrative Record to explain more fully what occurred in plaintiff's case.

June 27, 2007,[3] Mr. Joslyn submitted his unqualified resignation "due to family concerns" to the Army.  AR 154-55.  Lt. Col. Baker recommended approval of Mr. Joslyn's resignation with an honorable discharge that same day.  AR 152.  Lt. Col. Baker noted that Mr. Joslyn was physically qualified for an unqualified resignation and that he would be scheduled for the required medical examination prior to discharge.  Id.  Mr. Joslyn was counseled regarding his voluntary resignation as required by Army Reg. 600-8-24.  AR 149, 153.  Colonel James M. House also recommended approval of Mr. Joslyn's resignation request, AR 150, and the resignation request was approved on August 7, 2007, AR 144-46.  Mr. Joslyn was scheduled to separate from the Army on May 1, 2008. Id.

On December 12, 2007, Dr. Marie A. Adams, a psychiatrist at the Carl R. Darnall Army Medical Center at Fort Hood, Texas, determined that Mr. Joslyn failed to meet medical retention standards.  AR 120-23.  Dr. Adams noted that it was her opinion "with a reasonable degree of medical certainty given the above clinical presentation that CPT Joslyn is suffering from chronic post-traumatic stress disorder and it is affecting his ability to function in the military setting."  AR 122.  She also noted that Mr. Joslyn had been receiving treatment from a civilian doctor in Dallas for chronic post-traumatic stress disorder (PTSD) since May of 2006.  AR 121.  In the "Psychiatric MEB Narrative Summary," Dr. Adams wrote that Mr. Joslyn's "current symptoms have interfered with his ability to function in his job."  Id.  Dr. Adams referred Mr. Joslyn to an MEB[4] to begin Army DES processing.  AR 122-23.  Dr. Adams determined that Mr. Joslyn was competent to participate in the proceedings.  Id.  Dr. Adams also referenced Mr. Joslyn's back and knee injuries as requiring medical addendums.  AR 121.

Dr. Kimberly Kesling, a physician on the orthopedic staff of the Darnall Medical Center, provided a Medical Evaluation Board report dated March 13, 2008, in which Mr. Joslyn was diagnosed with "[l]umbar degenerative disk disease with facet arthrosis," "[l]eft anterior knee pain," and "[r]ight knee status post anterior cruciate ligament reconstruction."  AR 127.  All three diagnoses were denoted as developing in the line of duty and as service-aggravated.  Id.  The right knee status was specifically listed as "not unfitting."  Id.  Dr. Kesling noted, under the heading "Present Condition," that Mr. Joslyn "is unable to fulfill the requirements of his [military occupational specialty] secondary to

---

[3] Plaintiff's Complaint states that Mr. Joslyn submitted his resignation on or about May 8, 2007.  Compl. ¶ 17.  According to the Administrative Record, however, his resignation was submitted on June 27, 2007, and it was to be made effective May 1, 2008.  AR 154-55.

[4] In her December 12, 2007 recommendations, Dr. Adams mistakenly wrote that she was referring Mr. Joslyn to a PEB, AR 123, although she actually and properly referred Mr. Joslyn to an MEB, AR 130.

the pain in his back and now in his left knee." Id. Dr. Kesling completed a separate MEB referral notification form. AR 131.

The MEB Proceedings DA Form 3947 for Mr. Joslyn, dated March 31, 2008, listed three medically unacceptable conditions, as well as four medically acceptable conditions. AR 54. The three medically unacceptable conditions listed were chronic PTSD, lumbar degenerative disk disease with facet arthrosis and left anterior knee pain. Id. Dr. Adams and Dr. Kesling signed the form, recommending referral to a PEB; and the MEB's findings and recommendation were approved by the Approving Authority on May 5, 2008. AR 55. On May 6, 2008, Mr. Joslyn also signed the form, confirming that he had been informed of and agreed with the approved findings and recommendation of the board. Id. On May 26, 2008, Mr. Joslyn signed the form again, this time confirming that he had reviewed the MEB packet including the MEB proceedings form (DA Form 3947), Narrative Summary and the physical profile (DA Form 3349); that the MEB accurately covered all of his medical conditions; and that he understood that "the [PEB] may determine that some or all of the conditions listed in [his] MEB are not unfitting."[5] Id.

Included with the medical documents forwarded to the PEB on May 6, 2008, were memoranda from Mr. Joslyn's previous commanders and his Officer Evaluation Reports. AR 29. On February 14, 2008, Major Matthew J. Weinrich provided a memorandum addressed to the PEB verifying Mr. Joslyn's combat stressors, AR 92, and another memorandum verifying Mr. Joslyn's combat experience and medical history while deployed, AR 93. Major Weinrich was Mr. Joslyn's Company Commander from June 2003 to November 2003 while Mr. Joslyn served as a platoon leader in Iraq. AR 92. The company received mortar and small arms fire from one to several times per week, and Mr. Joslyn was involved in many combat patrols, both day and night. Id. In August 2003, Mr. Joslyn's Bradley Fighting Vehicle ran off the road and flipped upside down during a night combat patrol. AR 93. Mr. Joslyn was treated for possible neck and back injuries and was medevaced to another location for further evaluation. Id. Although Major Weinrich stated that he was unaware of Mr. Joslyn's current condition, he "believe[d] the accident may have caused injuries that now affect his ability to perform his current duties to his utmost potential." Id. According to Major Weinrich, on October 3, 2003, one of Mr. Joslyn's soldiers was killed by a rocket-propelled grenade during a firefight engagement with enemy combatants. AR 92. Mr. Joslyn's Bradley Fighting Vehicle was also hit by a rocket-propelled grenade with no resulting damage. Id. In his memorandum, Major Weinrich wrote:

---

[5] The court notes that the MEB proceedings had been forwarded to the informal PEB and the informal PEB had issued its finding of fitness on May 8, 2008, before Mr. Joslyn signed this acknowledgment. See AR 28, 55.

> [Mr. Joslyn's] platoon received in[-]theater treatment through a Combat Stress Detachment to deal with the incident.  [Mr.] Joslyn was having difficulty leading his platoon at that point.  In November 2003, [Mr.] Joslyn was removed from his platoon at my request from the Battalion Commander and transferred to Headquarters, 2nd Brigade, 4th Infantry Division as his performance as a leader and infantryman deteriorated as the enemy contact and combat stress increased.

AR 92.

    In addition to Major Weinrich's memorandum, the PEB received a performance statement letter dated March 10, 2008 from Lt. Col. Scott R. Baker, Mr. Joslyn's commander while he was assistant ROTC instructor at the University of Texas at Arlington.  See AR 36-37.  Lt. Col. Baker stated that Mr. Joslyn's "current duty performance has been satisfactory . . . over the past rating period," and then referenced Mr. Joslyn's last Officer Evaluation Report (OER), which was completed by Lt. Col. Baker for the period from June 14, 2006 through June 13, 2007 and was dated June 15, 2007.  AR 37, 94-95.  According to Lt. Col. Baker's letter, Mr. Joslyn "has the current ability to perform the duties normally expected of a junior Captain in the US Army," including performing in a satisfactory manner those tasks specifically listed.[6]  AR 36-37.  Lt. Col. Baker also noted that Mr. Joslyn was no longer working at the University of Texas at Arlington as he was supposed to start his terminal leave effective February 28, 2008.  AR 36.

    The PEB reviewed and sent back Dr. Adams's Narrative Summary regarding Mr. Joslyn's conditions so that she could include Lt. Col. Baker's letter and opine whether

---

[6] The listed tasks were:
    a.  Remember locations, work-like procedures and instructions.
    b.  Maintain an acceptable level of attention and concentration to carry out instructions and comp[l]ete tasks in a timely manner.
    c.  Communicate with others on work-related matters.
    d.  Relate civilly to supervisors and other workers.
    e.  Sustain an ordinary routine without special supervision.
    f.  Work with/near others without being unduly distracted by them.
    g.  Make simple work-related decisions.
    h.  Perform without an unreasonable number and ration of rest periods.
    i.  Ask simple questions and request[] help when appropriate.
    j.  Respond appropriately to changes in the work setting; and
    k.  Be aware of normal hazards and tak[e] appropriate precautions.
AR 37.

Mr. Joslyn could function in a civilian setting.  AR 53.  In response, Dr. Adams submitted a memorandum to the PEB dated April 23, 2008 that stated that she had reviewed both the commander's letter and the Narrative Summary.  Id.  She concurred with the assessment that Mr. Joslyn's performance was "sub-optimal and significantly impaired by his current PTSD symptoms," and she opined that Mr. Joslyn had "deficiencies in occupational functioning including difficulty in adapting to work" and "an inability to establish and maintain effective work relationships."  Id.  Dr. Adams reiterated her December 2007 opinion that Mr. Joslyn did not meet Army retention standards.  Id.

The informal PEB Proceedings DA Form 199 was dated May 8, 2008, two days after the case was referred by the MEB.  AR 28.  "Based on a review of the objective medical and personnel evidence of record and considering the physical requirements for reasonable performance of duties required by grade and military specialty," Mr. Joslyn was found "fit for duty within the limitations of the profile."  Id.  The narrative portion of the form further stated:

> [Mr. Joslyn] has performed his duties in an exceptional manner as evidenced by his Commander's letter dated 10 March 2008 and his OERs. His Commander states that he can adequately perform the duties of his office and grade.  His medical conditions of PTSD, degenerative disc disease and left knee pain did not prevent him from completing his military obligation or performing assigned duties.  The mere presence of a condition does not automatically constitute an unfit finding.

Id.  On May 13, 2008, within the allotted ten-day period, Mr. Joslyn completed his election in Block 13 on DA Form 199.  AR 24.  His initials appear beside the statement: "I do not concur and request a formal hearing.  I understand that I am not entitled to a formal hearing, and that the decision to grant a formal hearing is at the discretion of the PEB president."[7]  Id.  Mr. Joslyn also indicated that he would make a personal appearance at the formal hearing with counsel of his own choice.  Id.  Additionally, on May 13, 2008,

---

[7] Although not an issue necessary to the court's resolution of this case, the court notes that there is a discrepancy between the language on the DA Form 199 that Mr. Joslyn signed and the governing Army Regulation, which clearly states:  "A [s]oldier is entitled to a formal hearing if requested after informal consideration by a PEB."  Army Reg. 635-40, ¶ 4-21a.  The Army appears to have afforded soldiers rights additional to those provided by Department of Defense Instruction (DoDI) 1332.38, which implements policy, assigns responsibilities, and prescribes procedures under DoDI 1332.18 and Title 10 of the United States Code.  See DoDI 1332.38, ¶ 1 (Nov. 14, 1996).  DoDI 1332.38 states:  "Active duty and Ready Reserve members determined fit do not have an entitlement to a formal PEB since a finding of fit does not cause involuntary separation for physical disability."  DoDI 1332.38, ¶ E3.P1.3.3.1.2.

Mr. Joslyn signed a "PEBLO Counseling Checklist/Statement," acknowledging that Mr. John D. Grimnes, his PEBLO, had counseled him regarding MEB proceedings, PEB adjudication, PDA Review, Temporary Retirement Disability List, and benefits/programs. AR 25-26.

On June 11, 2008, Mr. Joslyn appeared, with counsel Mr. Thomas Kickler, at a formal hearing before the PEB.  AR 17, 19.  Two of the three board members at the formal hearing were the same as had constituted the informal PEB.  See AR 23, 27.  The formal PEB's DA Form 199, dated June 27, 2008, restated the narrative portion from the informal PEB form.  AR 17.  It then added:  "During formal proceedings, the PEB reevaluated all available medical records and sworn testimony by the [s]oldier.  Based on this review, the board considered the [s]oldier most appropriately rated [Fit for Duty]." Id.  The formal PEB also addressed counsel's contention, stating:

> [Mr. Joslyn's] record demonstrates that he has performed his duties in a satisfactory manner during the entire timeframe that he has had the symptoms of PTSD, low back pain, and left knee pain.  His OERs and Commander's letter show no adverse impact on his performance.  Although [Mr. Joslyn] states that he has no responsibilities other than to check on the supply room, this is not unexpected since he put in his resignation in May 2007 with anticipated transfer to the transition point in February 2008 with projected release 1 May 2008.  [Mr. Joslyn] stated that as he was doing his out-processing physical he discussed all of his physical complaints with the provider who then recommended a Medical Board.  There was no decrement in his performance due to these conditions.  In addition, there is no evidence that his conditions or their treatment have altered the status of his Top Secret Security Clearance.

Id.  That same day, June 11, 2008, Mr. Joslyn signed an acknowledgment that he had received the formal PEB Proceedings (DA Form 199), which was printed at the bottom of a letter detailing instructions for the attached election form (DA Form 199-1).  AR 21. The letter stated that Mr. Joslyn must complete and return the election form within ten days.  Id.  It also made clear that if the PEB did not receive the signed DA Form 199-1 or request for an extension of time within the allotted time period, PEB would presume that Mr. Joslyn agreed with the board's recommendation and forward the case to PDA for final action.  Id.

Mr. Joslyn failed to submit the election form within the ten-day period, and his case was forwarded to PDA on June 25, 2008.  AR 20.  The PEB findings were approved by PDA in a memorandum dated July 1, 2008, and his case was closed.  AR 15.  The memorandum "constitute[d] final administrative action regarding the disability processing

of [Mr. Joslyn]."  Id.  The memorandum noted that "[f]indings of fit are based on the preponderance of the evidence provided by the PEB," and instructed that if Mr. Joslyn's condition was determined to have worsened, the soldier's command or MTF should initiate a new MEB and forward it to the PEB for a new fitness determination.  Id.

According to Mr. Joslyn's Chronological MEB Case Status log kept by PEBLO John D. Grimnes, Mr. Grimnes spoke with Mr. Joslyn on Monday, June 23, 2008 to see if he had submitted his election, which was due at 8:00 a.m. that day.[8]  AR 7.  Mr. Grimnes then called the PEB, speaking with Ms. Steiner, to inform the board that Mr. Joslyn would be submitting his election that day, and confirmed with Mr. Joslyn the next day that he had indeed faxed his rebuttal to the PEB on June 23, 2008.  Id.  On June 26, 2008, Mr. Grimnes called Ms. Steiner at the PEB to ensure that Mr. Joslyn's rebuttal had been received and left a voicemail message.  Id.  On June 27, 2008, Mr. Grimnes heard from Ms. Steiner that Mr. Joslyn's rebuttal had not been received at the PEB and that his case had been forwarded to the PDA the day before, that is, on June 26, 2008.  Id.  Mr. Grimnes immediately called Mr. Joslyn to inform him of his case status, "e-mailed/faxed" Mr. Joslyn's "rebuttal/election" to the PEB and again spoke with Ms. Steiner at the PEB who confirmed that the rebuttal/election had been received and would be forwarded to the PDA for consideration.  Id.  On July 2, 2008 after receiving the PDA memorandum determining Mr. Joslyn fit for duty, Mr. Grimnes called the PDA and learned that the PDA had not received Mr. Joslyn's rebuttal/election.  Id.  Mr. Grimnes again faxed Mr. Joslyn's rebuttal/election to the PDA on July 3, 2008.[9]  Id.  On July 11, 2008, Mr. Joslyn e-mailed Mr. Albert Whitlock of the PDA.  AR 11.  Mr. Joslyn's e-mail stated:  "Sir, here are the new memos.  And my rebuttal.  The PEB never received these supposedly.  They never looked at any of these documents.  Thank you for your assistance."  Id.  In a reply e-mail, Mr. Whitlock confirmed that he had received the e-mail and would "submit it to [s]enior staff for review."  AR 9-10.

The "new memos," dated July 2, 2008, were written by Major (Retired) Ricardo Diaz, the Commandant of Cadets at the University of Texas at Arlington, describing Mr.

---

[8] Ten days from June 11, 2008 fell on Saturday, June 21, 2008.  If an election deadline falls on a Saturday or Sunday, the soldier must return the DA Form 199-1 to the PEB no later than 8:00 a.m. the following Monday.  AR 21.

[9] The court notes that Mr. Grimnes's actions in assisting Mr. Joslyn with the submission of his election and rebuttal came after the deadline and were therefore not as helpful as they might have been had they occurred even a few days before.  Mr. Joslyn does not claim that the PEBLO counseling and assistance he received were ineffective.  Despite the untimely submission, the PDA considered the election and rebuttal and declined to change its findings.  See AR 7.

Joslyn's duty performance over roughly two years beginning in November 2005.  AR 12-14.  Major Diaz wrote:

> [Mr. Joslyn] was either late or not prepared to run the morning's exercises for the cadets.  He complained about back problems and his inability to keep up with the cadets at physical fitness.  The drill team asked me to come to PT . . . which I did, eventually taking over the whole morning PT program.  I also had to take over duties as the Budget Officer, which normally would have been his job[,] because of deficiencies in his attention to detail.  I had to take over the logistics, also his job, because of his forgetfulness and inability to keep track of equipment and supplies.  Finally, after we missed a few suspenses, he was removed from the job and used sparingly as the Special Projects Officer.

AR 12.  Major Diaz further opined that "[Mr. Joslyn] does not seem to have the physical or mental ability to perform as a leader and a mentor.  I do not believe he will be able to perform the duties expected of his grade and branch."  Id.  Major Diaz concluded that Mr. Joslyn "performed his duties in a[n] unsatisfactory manner," specifically stating that Mr. Joslyn required supervision, was often tardy, had a hard time remembering instructions, lost focus and concentration, lacked attention, needed reminders to get work done, and was difficult to deal with more often than not.  AR 13.

On August 1, 2008, Mr. Grimnes received a phone call from Mr. Whitlock at the PDA confirming that the rebuttal/election had been received and considered by PDA and that the findings were unchanged.  AR 7.  That same day Mr. Grimnes informed Mr. Joslyn of the status of his rebuttal, id., and Mr. Joslyn e-mailed Mr. Whitlock, stating:

> Sir, based on the treatment and new care that I have received at the Warrior Transition Unit, I have new developments in my medical conditions that warrant a new review to begin at the MEB.  I have been advised by my nurse case manager of documents that were missing which need to be entered in or updated and replaced.  My PEBLO, Mr[.] Grimnes, would like to know of the status and see if it is even possible to recall my packet back to him.

AR 9.  On August 28, 2008, Mr. Grimnes received further confirmation from the PDA that the PEB's finding of fitness for Mr. Joslyn remained unchanged.  AR 7.

On November 7, 2008, Mr. Joslyn requested to withdraw his previously approved resignation request in order to participate in the Critical Skills Retention Bonus program.  AR 3.  Mr. Joslyn's commanders did not support his request.  Id.  At the bottom of Mr.

13

Joslyn's resignation withdrawal request, Battalion Commander William N. Greene circled "nonconcur" and wrote:  "Soldier is currently being considered for [Uniform Code of Military Justice (UCMJ)] for adverse actions."[10]  Id.; see AR 620-31.  Brigade Commander David Thompson also circled "nonconcur" and wrote, "[Mr. Joslyn] can not accomplish the simplest of task[s]."  AR 3.  Mr. Joslyn's request was formally denied by the Army on January 5, 2009.  AR 1.

On December 12, 2008, Mr. Joslyn spoke with Dr. Kathryn C. Trosky at the Darnall Medical Center.  AR 269.  Dr. Trosky noted that Mr. Joslyn expressed a need for a "not fit" memo because he was having his medical board resubmitted.  Id.  Dr. Trosky completed an evaluation form, checking the option "Not Fit For [D]uty - (NFFD) soldier meets retention standards per AR 40-501 and is not deployable."  AR 259.  One week later, after meeting with Mr. Joslyn, she revised her assessment based on additional information.  AR 252-53.  She completed a new evaluation form, this time checking the option "Fit For [D]uty - (FFD) soldier meets retention standards per AR 40-501 and is deployable."  AR 249.  On Mr. Joslyn's chronological record of medical care, Dr. Trosky wrote:

> Previous notes reviewed and integrated. . . .  I did not have all the accurate information when I deem[e]d this soldier not FFD last week.  I was under the impression that he was appealing his Medical Board, whereas he had already appealed and the original ruling was not overturned. . . .  He had

---

[10] Mr. Joslyn ultimately received a General Officer Memorandum of Reprimand dated December 17, 2008 and filed permanently in his Official Military Personnel File on January 20, 2009.  See AR 620-23.  The reprimand was "imposed as an administrative measure and not as punishment pursuant to the Uniform Code of Military Justice."  AR 623.  Mr. Joslyn was "reprimanded for repeatedly failing to go to [his] appointed place of duty between . . . September 2008 and November 2008."  Id.  "Even after being counseled and ordered by [his] Battalion Commander to go to [his] appointments, [Mr. Joslyn] still missed appointments. . . [showing] a disregard to orders and [his] obligations as an officer."  Id.  Mr. Joslyn submitted a rebuttal dated December 23, 2008, explaining that he was struggling with medical conditions that had caused him to miss appointments and that he was taking necessary steps not to miss any more.  AR 625.  He stated that he missed one appointment because of a scheduling error made by his nurse case manager and missed four early morning therapy appointments because he overslept while on a new dosage of sleep medication.  Id.  He admitted to forgetting about one of the six missed appointments.  Id.  During this time, Mr. Joslyn said he was taking new medications for his depression, anxiety, and sleep disorders.  Id.  In an effort not to miss any more appointments, he stated that he was no longer making appointments earlier than 9:00 a.m.  Id.  The Filing Recommendation, dated December 24, 2008 and signed by Warrior Transition Brigade Commander George J. Salerno, noted:  "CPT Joslyn had similar issues with his previous unit (ROTC-UTA).  There was no medical evidence to support or mitigate his misconduct."  AR 621.

neuropsychological testing done in Oct 2008 which showed very mild cognitive impairment which was not a medical boardable condition.

AR 252-53.  Dr. Trosky concluded, "[Mr. Joslyn] is deemed FFD and will [separate from the Army] on 30 Dec and follow-up with the VA."  AR 253.

Although Mr. Joslyn's medical records contain numerous references to medical boards and a pending appeal to the MEB, the Administrative Record does not contain any evidence that a physician or other authority referred Mr. Joslyn to a second MEB. Throughout his DES processing, Mr. Joslyn had received three incremental extensions of his separation date to allow completion of DES processing and medical care, or until fit for separation, whichever came first.  See AR 103, 109-11, 114.  Ultimately his separation date was extended from May 1, 2008 to December 31, 2008.  AR 103-04.  Mr. Joslyn was honorably discharged from the Army on December 31, 2008.  AR 2.  While the Army cleared him from the installation on January 5, 2009, his out-processing date remained December 31, 2008.  AR 137.  Mr. Joslyn filed his Complaint in this court on December 30, 2008, immediately prior to his discharge.  See Compl. 1.

II.    Legal Standards

    A.    Tucker Act Jurisdiction

The Tucker Act is the primary statute establishing the jurisdiction of the United States Court of Federal Claims (Court of Federal Claims).  See 28 U.S.C. § 1491 (2006). In relevant part, the statute provides that this court "shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States."  Id. § 1491(a)(1).  The Tucker Act provides the waiver of sovereign immunity necessary to sue the United States for money damages, but a plaintiff must establish an independent substantive right to money damages from the United States, that is, a money-mandating source within a contract, regulation, statute, or constitutional provision itself, in order for the case to proceed.  See United States v. Testan, 424 U.S. 392, 398 (1976).

The burden of proof to establish jurisdiction is borne by the plaintiff.  McNutt v. Gen. Motors Acceptance Corp., 298 U.S. 178, 189 (1936); Russell v. United States, 78 Fed. Cl. 281, 285 (2007).  If the defendant challenges jurisdictional facts, the plaintiff must support them with "competent proof."  McNutt, 298 U.S. at 189.  The plaintiff bears the burden to show by a preponderance of the evidence that jurisdiction is proper. Reynolds v. Army & Air Force Exch. Serv., 846 F.2d 746, 748 (Fed. Cir. 1988). Jurisdiction is a threshold matter and a case can proceed no further if the court lacks

15

jurisdiction to hear it.  Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94-95 (1998).
 When a federal court concludes that it lacks subject matter jurisdiction, "the court must
dismiss the complaint in its entirety."  Arbaugh v. Y & H Corp., 546 U.S. 500, 514
(2006).

B.    Motion to Dismiss

Rule 12(b) of the Rules of the United States Court of Federal Claims (RCFC)
governs motions to dismiss.  Specifically, RCFC 12(b)(1) provides for motions to dismiss
based on lack of subject matter jurisdiction, RCFC 12(b)(1), and RCFC 12(h)(3) states:
"If the court determines at any time that it lacks subject-matter jurisdiction, the court must
dismiss the action," RCFC 12(h)(3).  In evaluating a claim pursuant to RCFC 12(b)(1) for
lack of jurisdiction, the court must accept as true any undisputed allegations of fact made
by the non-moving party and draw all reasonable inferences from those facts in the
non-moving party's favor.  Henke v. United States, 60 F.3d 795, 797 (Fed. Cir. 1995); see
also Cambridge v. United States, 558 F.3d 1331, 1335 (Fed. Cir. 2009) (discussing RCFC
12(b)(6)); Reynolds, 846 F.2d at 747.

To determine whether the court has jurisdiction over a plaintiff's claims, the court
must ascertain whether any of the statutes identified in the plaintiff's complaint are
money-mandating.  Loveladies Harbor, Inc. v. United States (Loveladies), 27 F.3d 1545,
1554 (Fed. Cir. 1994).  In order to find that a statute or regulation is money-mandating,
"the allegation must be that the particular provision of law relied upon grants the
claimant, expressly or by implication, a right to be paid a certain sum."  Eastport S.S.
Corp. v. United States, 372 F.2d 1002, 1007 (Ct. Cl. 1967), abrogated in part on other
grounds by Malone v. United States, 849 F.2d 1441, 1444-45 (Fed. Cir. 1988).  "If the
court's conclusion is that the Constitutional provision, statute, or regulation meets the
money-mandating test, the court shall declare that it has jurisdiction over the cause, and
shall then proceed with the case in the normal course."  Fisher v. United States, 402 F.3d
1167, 1173 (Fed. Cir. 2005) (en banc portion).  In other words, if a plaintiff has identified
a money-mandating statute, the court's jurisdictional inquiry ends and a merits
determination begins.  See Adair v. United States, 497 F.3d 1244, 1251 (Fed. Cir. 2007).

C.    Motion for Judgment upon the Administrative Record

Rule 52.1 of the Rules of the United States Court of Federal Claims provides for
judgment upon the administrative record.  See RCFC 52.1.  A motion for judgment upon
the administrative record is distinguishable from a motion for summary judgment.
Bannum, Inc. v. United States (Bannum), 404 F.3d 1346, 1355 (Fed. Cir. 2005); see
Rules Committee Notes to RCFC 52.1 ("Summary judgment standards are not pertinent
to judicial review upon an administrative record.").  The standards and criteria governing

16

the court's review of agency decisions in response to a motion for judgment on the administrative record under RCFC 52.1 vary depending upon the specific law to be applied in the particular case.  See Rules Committee Notes to RCFC 52.1.  In reviewing a motion for judgment upon the administrative record, the court must determine whether a party has met its burden of proof based on the evidence in the record.  See Bannum, 404 F.3d at 1356.

Review of military disability cases is limited to "determining whether a decision of the Correction Board is arbitrary, capricious, unsupported by substantial evidence, or contrary to applicable statutes or regulations."[11]  Heisig v. United States, 719 F.2d 1153, 1156 (Fed. Cir. 1983).  "[T]he standard of review does not require a reweighing of the evidence, but a determination whether the conclusion being reviewed is supported by substantial evidence."  Id. at 1157 (emphasis omitted).  The court cannot substitute its judgment for that of the examining physicians, medical evaluation board, physical evaluation board or the Army Board for the Correction of Military Records.  See id. at 1156-57; Sanders v. United States, 594 F.2d 804, 813 (Ct. Cl. 1979) ("[W]hile [the court] may disagree with a correction board about whether or not a specific situation was unjust, [the court] will not substitute [its] judgment for the board's when reasonable minds could reach differing conclusions.").

---

[11] As the government states:  "Mr. Joslyn's case is somewhat unusual because, while he has been evaluated by the PEB, he has not availed himself of the administrative appeal process through the Army Board for Corrections of Military Records (ABCMR)."  Def.'s Mot. 20 (citing 10 U.S.C. § 1552 (2006)).  Here, the court is not reviewing a decision of a military correction board, but rather reviewing the PEB's decision directly.  The government also correctly notes that Mr. Joslyn is not required to exhaust his administrative remedies prior to pursuing judicial review of his military discharge proceedings.  See Heisig v. United States, 719 F.2d 1153, 1155 (Fed. Cir. 1983).  The judicial claim for disability retirement pay accrues upon final action of a board competent to pass upon eligibility for disability retirement, or upon refusal of a request for such a board.  Friedman v. United States, 310 F.2d 381, 395-96 (Ct. Cl. 1962).  The PEB is such a "first competent board" because it determines a service member's fitness for duty and entitlement to disability retirement.  See Chambers v. United States, 417 F.3d 1218, 1225 & n.2 (Fed. Cir. 2005).  When this court has reviewed the decision of a military disability evaluation board, this court has employed the same standard of review as for a correction board decision: whether the decision was "arbitrary, capricious, not supported by substantial evidence, or contrary to applicable statutes and regulations."  See Santiago v. United States, 71 Fed. Cl. 220, 226 (2006) (finding PEB's decision of "not unfitting" and PDA's affirmance of that decision to be arbitrary for failing to consider and address relevant evidence); see Bernard v. United States, 59 Fed. Cl. 497, 501 (2004), aff'd, 98 Fed. App'x 860 (Fed. Cir. 2004) (reviewing PEB and PDA proceedings); Heisig, 719 F.2d at 1156.

Plaintiff bears the burden to overcome the "strong, but rebuttable, presumption that administrators of the military . . . discharge their duties correctly, lawfully, and in good faith." Sanders, 594 F.2d at 813. The burden is on plaintiff to demonstrate that the actions of the Army were arbitrary and capricious, contrary to law, or unsupported by substantial evidence, by producing "cogent and clearly convincing evidence." Wronke v. Marsh (Wronke), 787 F.2d 1569, 1576 (Fed. Cir. 1986).

III.   Discussion

    A.   Motion to Dismiss for Lack of Subject Matter Jurisdiction

To determine whether jurisdiction lies over plaintiff's claims, the court must ascertain whether any of the statutes identified in plaintiff's Complaint are money mandating. Loveladies, 27 F.3d at 1554. Plaintiff's Complaint cites four statutes: 28 U.S.C. § 1491(a)(1) (Tucker Act), 28 U.S.C. § 2501 (Statute of Limitations), 28 U.S.C. § 1346(a)(2) (Little Tucker Act), and 5 U.S.C. § 706 (Administrative Procedure Act). Compl. ¶¶ 2, 3, 4-8, 9. The Tucker Act, 28 U.S.C. § 1491(a)(1), provides jurisdiction only where there is a "substantive right enforceable against the United States for money damages." Testan, 424 U.S. at 398. The Tucker Act is not, in itself, money mandating. See id.; supra Part II.A. Thus, the Tucker Act, standing alone, does not support this court's exercise of jurisdiction over plaintiff's claim.

Section 2501 of title 28 of the United States Code limits the court's jurisdiction to those claims that accrue no longer than six years before the complaint is filed: "Every claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues." 28 U.S.C. § 2501 (2006); see Young v. United States, 529 F.3d 1380, 1382 (Fed. Cir. 2008). Plaintiff asserts that the Complaint was filed "within six years of the action in question," an assertion of fact not disputed in this case. See Compl. ¶ 3; Def.'s Mot. 15. Although the statute of limitations is "jurisdictional," see John R. Sand & Gravel Co. v. United States, 552 U.S. 130, 135 (2008), plaintiff must still establish a money-mandating statute for this court to have subject matter jurisdiction over his claim, Testan, 424 U.S. at 398.

The Little Tucker Act, 28 U.S.C. § 1346(a)(2), states: "The district courts shall have original jurisdiction, concurrent with the United States Court of Federal Claims, of . . . [a]ny other civil action or claim against the United States, not exceeding $10,000 in amount, founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States . . . ." 28 U.S.C. § 1346(a)(2) (2006). The Little Tucker Act waives sovereign immunity and grants the district courts original jurisdiction over claims against the

18

government not exceeding $10,000 in amount.[12]  <u>Gonzales & Gonzales Bonds & Ins.</u>
<u>Agency, Inc. v. Dep't of Homeland Sec.</u>, 490 F.3d 940, 943 (Fed. Cir. 2007).  The Little
Tucker Act therefore has no relevance to a case brought in this court.[13]  Plaintiff's
Complaint asserts that the "amount in controversy is over $10,000 of back benefits, pay,
and interest if said interest is permissible by Congress."  Compl. ¶ 9.  If plaintiff's
assertion is taken as true, 28 U.S.C. § 1346(a)(2) is not applicable to this case.

Finally, plaintiff seeks "judicial review under § 706 of the Administrative
Procedure Act," asserting that the MEB, PEB, and Army acted "arbitrarily and
capriciously" in making various decisions.  Compl. ¶¶ 4-8.  In his prayer for relief,
plaintiff asks that, after holding those decisions to be arbitrary and capricious, the court:
(1) "evaluate [his individual identified conditions] in accordance with proper
regulations"; (2) "complete the MEB in accordance with proper regulations"; (3) "grant
the necessary medical extensions" or, in the alternative, "grant [p]laintiff's request to
withdraw his resignation papers"; (5) "[i]n the alternative, find [p]laintiff medically
retired at a rating consistent with the highest disability ratings for each of [p]laintiff's first
MEB findings"; (6) award plaintiff his costs and attorneys' fees; and (7) grant such other
relief as the court deems just and proper.  Compl. ¶¶ 40-45.

The Administrative Procedure Act (APA) is not a money-mandating statute.
<u>Wopsock v. Natchees</u>, 454 F.3d 1327, 1333 (Fed. Cir. 2006) (noting that "the APA does
not authorize an award of money damages at all; to the contrary, section 10(a) of the
APA, 5 U.S.C. § 702, specifically limits the Act to actions 'seeking relief other than
money damages'"); <u>Banerjee v. United States</u>, 77 Fed. Cl. 522, 534 (2007) ("The
Administrative Procedure Act is not a money mandating statute, since the APA waives

---

[12] The Little Tucker Act recognizes the concurrent jurisdiction of the United States Court
of Federal Claims (Court of Federal Claims) over claims against the government not exceeding
$10,000 in amount.  28 U.S.C. § 1346(a)(2) (2006).  The court does not view the Little Tucker
Act as creating jurisdiction in the Court of Federal Claims.  Rather, 28 U.S.C. § 1346(a)(2)
grants jurisdiction to the district court over certain claims and recognizes the separate grant of
jurisdictional authority to the Court of Federal Claims contained in 28 U.S.C. § 1491.  <u>See</u> 28
U.S.C. §§ 1346(a)(2), 1491.

[13] Further, the Little Tucker Act is not a money-mandating statute.  Like § 1491(a)(1),
§ 1346(a)(2) does not create any substantive right of action against the United States for money
damages.  <u>Litzenberger v. United States</u>, 89 F.3d 818, 820 (Fed. Cir. 1996) ("Although [28
U.S.C. § 1346(a)(2)] waives sovereign immunity, it does not create any substantive right
enforceable against the United States for money damages. . . . Thus, for a claim to be based on
the Little Tucker Act, it must be founded on a provision that can fairly be interpreted as
mandating compensation from the United States." (citations omitted)).

sovereign immunity only for claims seeking 'relief other than money damages.'" (quoting 5 U.S.C. § 702)).  Further, this court lacks general APA jurisdiction.  See Martinez v. United States, 333 F.3d 1295, 1313 (Fed. Cir. 2003) (noting that the Court of Federal Claims does not have APA jurisdiction to consider non-monetary suits to correct military records); McNabb v. United States, 54 Fed. Cl. 759, 767 (2002) ("In general, APA reviews are conducted in federal district court rather than the Court of Federal Claims, since the APA itself addresses 'relief other than money damages[,]' and money damages are the cornerstone of this court's Tucker Act jurisdiction." (citation omitted)).

"If the court's conclusion is that the source as alleged and pleaded is not money-mandating, the court shall so declare, and shall dismiss the cause for lack of jurisdiction, a Rule 12(b)(1) dismissal--the absence of a money-mandating source being fatal to the court's jurisdiction under the Tucker Act." Metz v. United States, 466 F.3d 991, 997 (Fed. Cir. 2006).  In his Complaint, plaintiff fails to invoke a money-mandating statute and therefore fails to meet his burden of proving that jurisdiction in this court is proper.  For these reasons, the court grants defendant's motion to dismiss for lack of subject matter jurisdiction.

B.      Motion for Judgment upon the Administrative Record

If the court limits its analysis to those jurisdictional bases set forth in the Complaint, plaintiff has made no claim within the jurisdiction of this court.  However, as alluded to by the parties in their motions and supporting briefs, plaintiff's Complaint can be read to suggest other statutory bases for his monetary claims.  In particular, as the government discusses in its Motion, plaintiff's Complaint could be interpreted as implicating several alternative statutory bases for this court's jurisdiction.  See Def.'s Mot. 18.  Although plaintiff did not include these jurisdictional allegations in his Complaint, the court will discuss these statutes in order to address Mr. Joslyn's case more fully.

As the government acknowledges, Mr. Joslyn's Complaint could be construed to include a claim for retirement pay under the money-mandating provisions of 10 U.S.C. § 1201.  See Compl. ¶¶ 33, 40, 43; Def.'s Mot. 18.  In addition, plaintiff's allegation that his request to withdraw his resignation was wrongfully denied could be construed as a wrongful discharge claim.  See Compl. ¶¶ 39, 42; Def.'s Mot. 18; Pl.'s Resp. 2-3. Wrongful discharge claims are generally brought under the money-mandating Military Pay Act, 37 U.S.C. § 204.  Martinez, 333 F.3d at 1303.  However, even if plaintiff's Complaint were construed to allege claims under these statutes--so that the court would have subject matter jurisdiction over his claims--for the reasons discussed below, the court finds that defendant is entitled to judgment upon the Administrative Record. Defendant is entitled to judgment upon the Administrative Record on Mr. Joslyn's claims

that the Army arbitrarily and unlawfully denied him a second MEB and a medical extension past December 31, 2008 because such claims are not supported by the Administrative Record.

1.     Claim for Disability Retirement Pay

Mr. Joslyn's Complaint could be construed to include a claim for retirement pay under the money-mandating 10 U.S.C. § 1201. See Compl. ¶¶ 1, 4, 33, 40, 43; Def.'s Mot. 18. In his Response to the government's motion to dismiss, Mr. Joslyn argues that he "implicitly sues under the Military Pay Act, 37 U.S.C. § 204." Pl.'s Resp. 2. Referencing 37 § U.S.C. 204(h)(1), plaintiff states that he is "clearly stating a claim under his retirement pay, e.g.[,] his military medical retirement." Pl.'s Resp. 3. As the government correctly points out, disability retirement pay claims, such as the one asserted by Mr. Joslyn, are not governed by the Military Pay Act but by 10 U.S.C. § 1201. Def.'s Reply 2. Section 1201 of title 10 of the United States Code authorizes the Secretary of the Army to retire a soldier with retirement pay after a determination that the soldier is unfit to perform the duties of his or her office, grade, rank, or rating because of physical disability incurred while entitled to basic pay. 10 U.S.C. § 1201 (2006). Mr. Joslyn's implied argument is that he should not have been separated from the Army but rather retired after being found unfit to perform his duties due to physical disability, a circumstance which would have entitled him to disability retirement pay under 10 U.S.C. § 1201. See Compl. ¶¶ 1, 4, 33, 40, 43.

a.     Legal Standard

When this court is asked to review the decision of a military disability evaluation board, the standard of review is whether the decision was "arbitrary, capricious, not supported by substantial evidence, or contrary to applicable statutes and regulations." Santiago v. United States, 71 Fed. Cl. 220, 226 (2006); Bernard v. United States, 59 Fed. Cl. 497, 501 (2004), aff'd, 98 Fed. App'x 860, 862 (Fed. Cir. 2004); see Heisig, 719 F.2d at 1156. "[T]he standard of review does not require a reweighing of the evidence, but a determination whether the conclusion being reviewed is supported by substantial evidence." Heisig, 719 F.2d at 1157. The court cannot substitute its judgment for that of the examining physicians, medical evaluation board, physical evaluation board or the Army Board for the Correction of Military Records. See id. at 1156-57; Sanders, 594 F.2d at 813 ("[W]hile [the court] may disagree with a correction board about whether or not a specific situation was unjust, [the court] will not substitute [its] judgment for the board's when reasonable minds could reach differing conclusions.").

The plaintiff bears the burden to overcome the "strong, but rebuttable, presumption that administrators of the military . . . discharge their duties correctly, lawfully, and in

good faith." <u>Sanders</u>, 594 F.2d at 813.  The plaintiff must demonstrate that the actions of the Army were arbitrary and capricious, contrary to law, or unsupported by substantial evidence, by producing "cogent and clearly convincing evidence." <u>Wronke</u>, 787 F.2d at 1576.  Under the substantial evidence standard, "<u>all</u> of the competent evidence must be considered, whether original or supplemental."[14]  <u>Heisig</u>, 719 F.2d at 1157.  Substantial evidence is defined as "more than a mere scintilla." <u>Consol. Edison Co. v. Nat'l Labor Relations Bd.</u>, 305 U.S. 197, 229 (1938).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Id.</u>; <u>see also</u> <u>Jennings v. Merit Sys. Prot. Bd.</u>, 59 F.3d 159, 160 (Fed. Cir. 1995); <u>Heisig</u>, 719 F.2d at 1156.  To prevail under the arbitrary and capricious standard, plaintiff must demonstrate that evidence was ignored or unreasonably construed, or that designated duties were not

--------

[14] The phrase "whether original or supplemental," often quoted in other cases, raises the question of what constitutes supplemental evidence.  The court understands "supplemental evidence" in this context to be evidence taken de novo by the reviewing court and not included in the Administrative Record.  <u>See</u> <u>Brown v. United States</u>, 396 F.2d 989, 991-92 (Ct. Cl. 1968) (describing "evidence over and above that presented before the administrative boards" as separate from "record evidence"); <u>Walls v. United States</u>, 582 F.3d 1358, 1367, 1368 & n.13 (2009) (differentiating between "the administrative record already in existence" and "some new record made initially in the reviewing court" and noting that the administrative record may be supplemented in "extremely limited situations").  The court notes the possible uncertainty that exists regarding the continued appropriateness of the court's accepting de novo evidence in military pay cases except in certain circumstances.  <u>See</u> <u>Walls</u>, 582 F.3d at 1369, 1376 (Newman, J., dissenting) (questioning the panel majority's view of <u>Brown</u> because no Federal Circuit en banc decision or Supreme Court decision has overruled <u>Brown</u>).  <u>Compare</u> <u>Brown</u>, 396 F.2d at 991-92, 996-97 (describing and reaffirming the court's practice in military pay cases of regularly considering under the substantial evidence standard "evidence over and above that presented before the administrative boards if a party wishes to offer it" along with record evidence) <u>with</u> <u>Walls</u>, 582 F.3d at 1367-68 (interpreting Supreme Court and Federal Circuit decisions since <u>Brown</u> to establish that "review under the Administrative Procedure Act [(APA)] is generally limited to the administrative record," which should be supplemented "only if the existing record is insufficient to permit meaningful review consistent with the APA").

The issue of supplemental evidence received de novo by the court is not implicated in this case because all of the evidence is contained in the Administrative Record.  Although some evidence in the Administrative Record--namely, the memorandum from Major Diaz--was not originally before the PEB during its proceedings, it was presented to the PEB after the election period and was forwarded to the PDA for consideration.  AR 9-14.  The Diaz memorandum and related communications were contained in the Administrative Record presented to the court, and as such the court does not understand them to be "supplemental evidence."

performed by the military disability evaluation board.  See Stephens v. United States, 358 F.2d 951, 955 (Ct. Cl. 1966); Fluellen v. United States, 44 Fed. Cl. 97, 101 (1999).

b.      Analysis

The PEB determined Mr. Joslyn fit for duty "[b]ased on a review of the objective medical and personnel evidence of record and considering the physical requirements for reasonable performance of duties required by [his] grade and military specialty."  AR 28. As the PEB Proceedings Forms emphasize, "The mere presence of a condition does not automatically constitute an unfit finding."  AR 17, 28; see Army Reg. 635-40, ¶ 3-1 ("The mere presence[] of an impairment does not, of itself, justify a finding of unfitness because of physical disability.").  Army Regulations require the PEB to compare the nature and degree of physical disability present with the duty requirements of the soldier's grade and military specialty and to determine fitness or unfitness based on a preponderance of the evidence.  Army Reg. 635-40, ¶ 3-1.  The PEB relied on evidence before it--Lt. Col. Baker's letter describing Mr. Joslyn's performance of duty as satisfactory and his Officer Evaluation Reports--to decide that Mr. Joslyn's medical conditions were not unfitting.  It found that Mr. Joslyn's medical conditions "did not prevent him from completing his military obligation or performing assigned duties."  AR 17.  The PEB specifically addressed the contentions of Mr. Joslyn's counsel that plaintiff had no responsibilities other than checking on the supply room.  Id.  The PEB explained that this limited duty was not unexpected because Mr. Joslyn was transitioning out of the Army.  Id.  The PEB also noted that there was no evidence that plaintiff's conditions or their treatment had altered the status of plaintiff's Top Secret Security Clearance.  Id.  The PDA reviewed the case for error or injustice and found none.  See AR 15; Army Reg. 635-40, ¶ 4-22b.

In an analogous circumstance applying the substantial evidence rule, the United States Court of Appeals for the Federal Circuit (Federal Circuit) upheld a district court's decision that the Board's conclusions were supported by substantial evidence despite the existence of significant contrary evidence.  Heisig, 719 F.2d at 1157.  The Federal Circuit stated:

[T]here is no indication that the board ignored the governing regulations, or acted upon unsubstantial evidence, or both.  The district court found substantial evidence to support the critical central administrative finding that, notwithstanding the fully presented medical problems, appellant was fit for duty. . . .  Nor can it be said that Heisig's application received less than adequate consideration.  His application has been considered and reconsidered at every level of the several reviews he has received.  There being substantial supporting evidence, and no showing that the administrative determinations were contrary to law, regulation, or

mandatory published procedure, it follows that there is no basis for a
finding, and there correctly was no finding by the district court, that the
administrative action complained of was arbitrary, capricious, or in bad
faith.

Heisig, 719 F.2d at 1157 (internal quotation marks omitted).

The court can find no evidence or fact properly put before the PEB that was
overlooked or ignored.[15]  The PEB stated that it carefully considered all of the evidence
that was before it.  The court does not believe, in light of Heisig, that the PEB was
required separately to itemize all of the medical and other evidence that was before it.  It
is sufficient that the PEB addressed the evidence and articulated and applied the correct
legal standard.  It is true that the PEB had evidence of Mr. Joslyn's medical conditions
and evidence that those conditions were interfering with Mr. Joslyn's performance of
duty.  Finding certain medical and other evidence unpersuasive is not the same as
ignoring evidence.  In the court's view, the PEB's decision was neither arbitrary nor
capricious.  Because the PEB found Mr. Joslyn fit for duty, he is not entitled to disability
retirement pay under 10 U.S.C. § 1201.

2.      Wrongful Discharge Claim

Mr. Joslyn's allegation that his request to withdraw his resignation was wrongfully
denied could be construed as a wrongful discharge claim.  See Compl. ¶¶ 39, 42; Def.'s
Mot. 18.  Wrongful discharge claims are generally brought under the money-mandating
Military Pay Act, 37 U.S.C. § 204.  Martinez, 333 F.3d at 1303.  Plaintiff does not cite the

---

[15] The court recognizes that the PEB did not have before it the memorandum from Major
Diaz regarding Mr. Joslyn's unsatisfactory performance of duty.  See AR 11-14.  The PEB and
the PDA did, however, have an opportunity to consider the Diaz memorandum after issuing their
decisions and both bodies reported their findings unchanged as a result.  See AR 7, 9-10, 15.
Even considering the additional evidence contained in the Administrative Record that was not
originally before the PEB, the court concludes that the PEB's decision was supported by
substantial evidence.  See Sanders v. United States, 594 F.2d 804, 813 (Ct. Cl. 1979) ("[W]hile
[the court] may disagree with a [] board about whether or not a specific situation was unjust, [the
court] will not substitute [its] judgment for the board's when reasonable minds could reach
differing conclusions.").  The court also notes that the additional evidence--namely, the Diaz
memorandum and plaintiff's contention that his positive Officer Evaluation Report from Lt. Col.
Baker was the result of plaintiff's agreeing to resign from the Army--was not new but with
reasonable diligence could have been presented to the PEB in the initial proceedings.  See Walls,
582 F.3d at 1368 (suggesting that evidence that could have been submitted to the original board
and is submitted in the first instance to the court should be excluded).

Military Pay Act in his Complaint.  See supra Part III.A.  In his Response to the government's motion to dismiss, however, Mr. Joslyn argues that he "implicitly sues under the Military Pay Act, 37 U.S.C. § 204."  Pl.'s Resp. 2.  Section 204 of title 37 of the United States Code provides that a member of a uniformed service who is on active duty is entitled to the basic pay of the pay grade to which the member is assigned or distributed in accordance with the member's years of service.  37 U.S.C. § 204 (2006).

      a.    Legal Standard

In order to bring a military discharge case in the Court of Federal Claims, a plaintiff must allege that, "because of the unlawful discharge, the plaintiff is entitled to money in the form of the pay that the plaintiff would have received but for the unlawful discharge."  Martinez, 333 F.3d at 1303.  A military officer is "entitled to basic pay as 'a member of a uniformed service who is on active duty.'"  Adkins v. United States, 68 F.3d 1317, 1321 (Fed. Cir. 1995) (quoting 37 U.S.C. § 204(a)(1)).  "[I]f a plaintiff cannot establish that he is currently on active duty, he must assert and ultimately establish that his separation was involuntary in order to fit within the scope of, and take advantage of, the money-mandating status of § 204, or else his claim falls for failure to state a claim upon which relief can be granted."  Metz, 466 F.3d at 998.

The voluntariness of a plaintiff's discharge is not a jurisdictional issue but rather should be considered in the context of the merits of a plaintiff's case.  Id.  The court must determine, in this voluntariness inquiry, whether plaintiff has made a free choice to resign.  See McIntyre v. United States, 30 Fed. Cl. 207, 211 (1993) ("The focus of [the voluntariness] inquiry is whether the plaintiff exercised a free choice in making the resignation or retirement decision.").  A resignation from the military is presumed to be voluntary.  Tippett v. United States, 185 F.3d 1250, 1255 (Fed. Cir. 1999), abrogated in part on other grounds by Metz, 466 F.3d at 995.

The presumption of a voluntary resignation is rebuttable in certain circumstances.  Scharf v. Dep't of the Air Force, 710 F.2d 1572, 1574 (Fed. Cir. 1983).  "An otherwise voluntary resignation . . . is rendered involuntary if it . . . results from misrepresentation or deception on the part of government officers."  Tippett, 185 F.3d at 1255 (citations omitted).  As enumerated by the Federal Circuit in Scharf, the presumption of voluntariness may be vitiated when an employee:  (1) unsuccessfully tries to withdraw his resignation before its effective date, see Cunningham v. United States, 423 F.2d 1379, 1384-85 (Ct. Cl. 1970) (holding plaintiff unlawfully separated because Air Force failed to exercise discretion in denying plaintiff's request to withdraw her resignation two weeks before its effective date); (2) submits a resignation under time pressure, see Perlman v. United States, 490 F.2d 928, 932-33 (Ct. Cl. 1974) (ruling plaintiff's retirement involuntary given the fact that plaintiff had fewer than eight hours to verify information

integral to his retirement decision); or (3) fails to understand the situation due to mental incompetence, see Manzi v. United States, 198 Ct. Cl. 489, 492 (1972) (holding plaintiff's resignation involuntary because plaintiff was emotionally disturbed and incapable of understanding his act).  See Scharf, 710 F.2d at 1574.

The presumption of a voluntary resignation survives, however, even if the plaintiff is confronted with "a choice of unpleasant alternatives."  Sammt v. United States, 780 F.2d 31, 33 (Fed. Cir. 1985).  The exercise of an option to resign is not "rendered involuntary by the imminent imposition of a less desirable alternative."  Id. at 32; see also Scarseth v. United States, 52 Fed. Cl. 458, 474 (2002) ("The fact that [the plaintiff] was required to choose between submitting a voluntary resignation and facing trial by court-martial does not render his resignation involuntary.")

b.    Analysis

Mr. Joslyn's allegation that his request to withdraw his resignation was wrongfully denied could be construed as a wrongful discharge claim.  See Compl. ¶¶ 39, 42; Def.'s Mot. 18.  In other words, plaintiff's allegation could be interpreted as an argument that his resignation was not voluntary.  In his Complaint, Mr. Joslyn does not allege that he is entitled to money in the form of the pay that he would have received but for the unlawful discharge, nor does he directly allege that his resignation was involuntary.  In his Complaint, plaintiff alleged that if he had not submitted his resignation, "he would [have] receive[d] a negative Officer Evaluation Report [that] would [have] be[en] detrimental to [his] career."  Compl. ¶ 16.  It appears to the court that Mr. Joslyn was faced with "a choice of unpleasant alternatives," a situation that, however unfortunate, did not render his resignation involuntary.  See Sammt, 780 F.2d at 33; Scarseth, 52 Fed. Cl. at 474.

In the court's view, Mr. Joslyn has not alleged circumstances that would rebut the presumption of voluntariness.  Mr. Joslyn does not allege misrepresentation or deception on the part of government officers nor that he submitted his resignation under time pressure, and the facts as presented in the Administrative Record do not suggest that he could have made such an allegation.  Nor does Mr. Joslyn allege that his request to withdraw his resignation was timely and that the Army declined to exercise its discretion in denying it; nor does he allege that he failed to understand his situation at the time of his resignation due to mental incompetence.  However, because the Administrative Record and Mr. Joslyn's Complaint and supporting briefs could be read to provide some support for these possible allegations, the court discusses them below.

Mr. Joslyn did try to withdraw his resignation prior to his separation, but his withdrawal request had no bearing on the voluntariness of his prior resignation.  Mr. Joslyn's resignation was voluntary at the time it was submitted, and he did not attempt to

withdraw his resignation until approximately sixteen months later, well after his resignation had been approved.  The Army acted within its wide discretion to accept or reject his resignation withdrawal request.  See Cole v. United States, 689 F.2d 1040, 1041 (Ct. Cl. 1982).  On June 27, 2007, Mr. Joslyn submitted his unqualified resignation "due to family concerns" to the Army.  AR 154-55.  In his June 27, 2007 resignation memorandum, Mr. Joslyn wrote, "I understand that my resignation is voluntary and I am not entitled to separation pay."  AR 155.  Mr. Joslyn's resignation was to be effective May 1, 2008, and although his separation date was extended to allow time for his DES processing, he did not request to withdraw his resignation request until November 7, 2008.  See AR 3, 103-04, 144-46, 154-55.

The involuntariness of a resignation application must be shown by a timely request to withdraw the application, see Gallucci v. United States, 41 Fed. Cl. 631, 642 (1998) (stating that a timely request to withdraw a resignation under the applicable military regulations is a "condition[ ] precedent to granting such a request"); Brown v. United States, 30 Fed. Cl. 227, 231 (1993) (finding an attempted withdrawal untimely because it was submitted after the voluntary resignation was accepted); and by the denial of a procedural right guaranteed by statute or regulation, see Cunningham, 423 F.2d at 1385 (finding that "both the [Air Force] and the Civil Service Commission erred in denying plaintiff's procedural rights under the Veterans' Preference Act").  Under Army regulations, there is no set time period for withdrawing a resignation,[16] unlike the Marine Corps regulations discussed in Gallucci.  See Gallucci, 41 Fed. Cl. at 642 (finding that the plaintiff's request to withdraw his resignation was not timely because it was not submitted at least forty-five days before his separation as required by Marine Corps regulations).  However, Mr. Joslyn did not submit his request to withdraw his resignation until well over a year after his unqualified resignation was submitted and approved, rendering his

---

[16] Army Regulation 600-8-24 states:

An officer may request withdrawal of resignation at any time prior to commencing travel pursuant to orders issued for the purpose of separating the officer.  The request, including reasons, will be forwarded through [the appropriate channels].  Each forwarding endorsement will include recommendation for approval or disapproval.  Reasons for disapproval will be stated.

A resignation may be withdrawn only with the approval of [Headquarters, Department of the Army], with the exception of an unqualified resignation.  An unqualified resignation may be withdrawn on the approval of an endorsing commander in the field and returned to the officer concerned, provided the resignation has not been forwarded by the commander to [Commanding General, Human Resources Command].

Army Reg. 600-8-24, ¶ 3-2 (Apr. 12, 2006).

withdrawal request untimely.  See Brown, 30 Fed. Cl. at 231, aff'd, 26 F.3d 139 (Fed. Cir. 1994) (finding untimely a resignation withdrawal request submitted in mid-October after the resignation had been submitted in late July and accepted in early September).

Even if plaintiff's request to withdraw his resignation had been timely, the Army acted within its wide discretion to accept or reject his request.  In the military pay context, "strong policy reasons compel courts 'to allow the widest possible latitude to the armed services in their administration of personnel matters.'"  Voge v. United States, 844 F.2d 776, 782 (Fed. Cir. 1988) (quoting Sanders, 594 F.2d at 813).  "The Secretary [of the Army] can exercise discretion to accept [a resignation] or not, and allow the withdrawal [of a resignation] or not, and his decision will be sustained if not arbitrary and capricious and contrary to law."  Cole, 689 F.2d at 1041.  The Army's decision of whether or not to accept a withdrawal of a resignation "must be granted substantial deference."  Brown, 30 Fed. Cl. at 231.  In this case, the Army did not summarily refuse Mr. Joslyn's request to withdraw his resignation.  See Cunningham, 423 F.2d at 1384 (holding plaintiff's resignation involuntary where plaintiff timely submitted a request to withdraw her resignation and was denied without any demonstrable exercise of discretion).  Nor did the Army unreasonably exercise its discretion in denying Mr. Joslyn's request to withdraw his resignation.  His request was "reviewed as an exception to policy and not favorably considered" because "the reasons presented did not justify approval of the request."  AR 1.  Mr. Joslyn's commanders had indicated that they did not agree with his request to withdraw his resignation, in part because he was under consideration for UCMJ adverse action for failure to keep appointments and report for duty.  See AR 3, 620-31; supra note 9.  Mr. Joslyn's request to withdraw his resignation was processed in accordance with Army regulations, including appropriate consideration of the input from his chain of command.  See Army Reg. 600-8-24, ¶ 3-2; AR 1.  The Army was within its discretion and did not act arbitrarily or capriciously when it denied Mr. Joslyn's November 2008 request to withdraw his previously approved resignation.

Plaintiff does not allege that he failed to understand his situation at the time of his resignation due to mental incompetence.  In his Complaint, Plaintiff alleges that he was diagnosed with PTSD in May 2006 and that the MEB diagnosed him with chronic PTSD in March 2008.  Compl. ¶¶ 15, 20.  In his Response, plaintiff argues that his separation was not voluntary because he did not concur with the PEB and PDA findings and because, plaintiff asserts (without support in the Administrative Record), he "did not knowingly accept the separation because he was not mentally competent at the time [he signed the PEB proceedings form]."  Pl.'s Resp. 3, 9.  Moreover, Mr. Joslyn's allegation of mental incompetence was not made in the Complaint.  The late-appearing allegation of his incompetence when he signed the PEB proceedings form does not support a finding that Mr. Joslyn was mentally incompetent at the time of his resignation--the relevant time for determining the voluntariness of his resignation.

Because plaintiff has not met his burden of proving that his resignation from the Army was involuntary, his claim does not fall within the scope of the money-mandating provisions of § 204, and his claim must fail.  See Metz, 466 F.3d at 998.

 3. Claim Regarding Denial of Second MEB and Medical Extension

 In his Complaint, Mr. Joslyn claims that he was "wrongfully denied to continue [sic] a second [MEB] as expressed to him by his military medical practitioners" and that he was "wrongfully denied a medical extension in order to complete a second military examination board."  Compl. ¶ 1.  Plaintiff asserts that the Army acted arbitrarily and capriciously "in its failure to fulfill the second MEB" and "in its denial of Plaintiff's October 2008 request for a medical extension."  Compl. ¶¶ 6-7, 35, 37.  Plaintiff asks the court to hold these actions to be arbitrary and capricious, and upon so holding, "complete the MEB in accordance with proper regulations" and "grant the necessary medical extensions."  Compl. ¶¶ 41-42.  As the government contends, the Administrative Record does not support Mr. Joslyn's claims.  Def.'s Mot. 25-28.  There is no evidence that Mr. Joslyn was ever referred for a second MEB or that he requested an extension past his December 31, 2008 separation date.

 To support his allegation that the Army failed to complete a second MEB, Mr. Joslyn asserts that he was informed by his primary care manager, Dr. Gene Joe, on or about July 15 and August 15, 2008, that he would be undergoing a second MEB.  Compl. ¶ 23.  Mr. Joslyn's medical records reflect that he was a new intake patient to the Warrior Transition Unit when he was seen on July 15, 2008.  AR 600.  Dr. Joe noted that Mr. Joslyn's MEB evaluation and Narrative Summary had been completed by Dr. Adams.  Id. Dr. Joe indicated that the treatment plan was to continue the MEB process and continue medical management of Mr. Joslyn's conditions.  Id.  There is no evidence that Dr. Joe or any other physician referred plaintiff for a second MEB.  See, e.g., id.  Numerous references to a continuing MEB process appear in Mr. Joslyn's medical records after his case was finalized in July 2008.  See AR 504, 532-33, 551-52, 562-63, 571, 593, 597. The source of the information, however, appears to have been Mr. Joslyn himself as he represented to his physicians that the MEB was ongoing.  See AR 295, 426.  On December 8, 2008, after Mr. Joslyn indicated he was displeased with being found fit for duty, Dr. Lawrence M. Martinek explained to Mr. Joslyn that the physician cannot overturn the findings of the MEB.  AR 296.  A soldier also cannot refer himself to an MEB but must be referred by a commander or a physician.  See Army Reg. 635-40, ¶ 4-8. There is no evidence that Mr. Joslyn's conditions worsened such that a physician referred him for a second MEB.  See AR 252-53, 281.

 The Administrative Record also contains no evidence that Mr. Joslyn requested an extension of his separation date past December 31, 2008.  Mr. Joslyn requested and

received three medical extensions to complete the disability evaluation process. AR 106, 114, 138. The final extension allowed him to remain on active duty until December 31, 2008. AR 138. No second MEB commenced, and no record evidence supports Mr. Joslyn's allegation that he requested another extension or that another extension was denied him. Because the Administrative Record does not support Mr. Joslyn's claims that the Army arbitrarily and unlawfully denied him a second MEB and a medical extension past December 31, 2008, defendant is entitled to judgment upon the Administrative Record on these claims.

## IV.   Transfer

In accordance with statute and precedent the court will consider whether it may transfer plaintiff's claims to another court. See Tex. Peanut Farmers v. United States, 409 F.3d 1370, 1374-75 (Fed. Cir. 2005) (stating that the Court of Federal Claims should have considered whether transfer was appropriate once the court determined that it lacked jurisdiction). Section 1631 of title 28 of the United States Code provides, "Whenever a civil action is filed in a court as defined in section 610 of this title . . . and that court finds that there is a want of jurisdiction, the court shall, if it is in the interest of justice, transfer such action . . . ." 28 U.S.C. § 1631 (2006) (emphasis added). In order for a case to be transferred, the court must find that: (1) the transferring court lacks subject matter jurisdiction; (2) at the time the case was filed, the case could have been brought in the transferee court; and (3) such a transfer is in the interest of justice. See 28 U.S.C. § 1631; United States v. John C. Grimberg Co., 702 F.2d 1362, 1364 n.5, 1374 (Fed. Cir. 1983). "Whether a case should be transferred rests within the sound discretion of the transferor court." Faulkner v. United States, 43 Fed. Cl. 54, 56 (1999). If such transfer "would nevertheless be futile given the weakness of plaintiff's case on the merits," the deciding court may decline to transfer the case and dismiss it. Id. (quoting Siegal v. United States, 38 Fed. Cl. 386, 390 (1997)).

The court concludes that the Court of Federal Claims would have been the appropriate forum to consider plaintiff's claims had plaintiff established this court's jurisdiction in his Complaint. This court lacks subject matter jurisdiction only because plaintiff failed to plead the appropriate money-mandating statutes. In his Complaint, plaintiff alleged that the amount in controversy is greater than $10,000, Compl. ¶ 9, which places it outside of the concurrent jurisdiction of the district courts. See 28 U.S.C. § 1346(a)(2) (providing that the district courts shall have concurrent jurisdiction over claims "not exceeding $10,000 in amount"). It is not in the "interest of justice" to transfer Mr. Joslyn's Complaint because there is a high likelihood that his claims would not be

cognizable in another court of the United States.[17]  Plaintiff has failed to establish this court's jurisdiction in his Complaint, see supra Part III.A; and even if plaintiff had alleged jurisdiction under appropriate statutes, the government would be entitled to judgment upon the Administrative Record, see supra Part III.B.  For the foregoing reasons, the court finds that this case does not meet the requirements for transfer and declines to transfer this case to a district court pursuant to 28 U.S.C. § 1631.

V.     Conclusion

        The court concludes that plaintiff has failed to prove that the court possesses jurisdiction over his claims and that, even if plaintiff had alleged jurisdiction under appropriate statutes, defendant would be entitled to judgment on the Administrative Record.  This court has the power to review military retirement and disability pay decisions and final decisions concerning the correction of military records.  However, for the court to review such decisions, there must exist an underlying money-mandating statute or regulation under which a plaintiff can state a claim.  The court is appreciative of plaintiff's service to the United States and sympathetic to his situation, but does not find that applicable law supports his claims.

        The court, therefore, GRANTS defendant's Motion to Dismiss plaintiff's claims as pleaded in his Complaint for lack of subject matter jurisdiction.  In the alternative, the court ENTERS JUDGMENT on the Administrative Record for defendant on plaintiff's claims as advanced in his Response and as more particularly described above in Part III.B, and denies plaintiff's Cross-Motion for Judgment upon the Administrative Record. No costs.

        IT IS SO ORDERED.

                                              s/ Emily C. Hewitt
                                              EMILY C. HEWITT
                                              Chief Judge

---

        [17] The court notes that a plaintiff may pursue administrative remedies with the Army and then seek judicial review of any adverse Correction Board decision--for example, regarding a discharge from the military--in a federal district court under the Administrative Procedure Act, 5 U.S.C. § 702.  See Martinez v. United States, 333 F.3d 1295, 1326-27 (Fed. Cir. 2003).  This was not the claim brought here.